1   RONALD L. JOHNSTON (State Bar No. 57418)
    Ronald.Johnston@aporter.com
2   JOHN C. ULIN (State Bar No. 165524)
    John.Ulin@aporter.com
3   JAMES S. BLACKBURN (State Bar No. 169134)
    James.Blackburn@aporter.com
4   ARNOLD & PORTER LLP
    777 South Figueroa Street, 44th Floor
5   Los Angeles, California  90017-5844
    Telephone: (213) 243-4000
6   Facsimile:  (213) 243-4199
7
8   *Attorneys for Plaintiffs*
9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                    **WESTERN DIVISION**

13  | NBCUNIVERSAL MEDIA, LLC, UNIVERSAL NETWORK | ) | Case No.: 2:12-cv-06950 (GW) (JCx) |

NBCUNIVERSAL MEDIA, LLC,
UNIVERSAL NETWORK
TELEVISION, LLC,
OPEN 4 BUSINESS PRODUCTIONS
LLC,
NBC SUBSIDIARY (KNBC-TV) LLC,
TELEMUNDO NETWORK GROUP
LLC,
WNJU-TV BROADCASTING LLC,
AMERICAN BROADCASTING
COMPANIES, INC.,
ABC HOLDING COMPANY INC.,
DISNEY ENTERPRISES, INC.,
CBS BROADCASTING INC.,
CBS STUDIOS INC., and
BIG TICKET TELEVISION, INC.,

                    Plaintiffs,

         v.

BARRY DRILLER, INC.,
BARRYDRILLER CONTENT
SYSTEMS PLC, AEREOKILLER LLC,
and JOHN DOES 1-10,

                    Defendants.

Case No.: 2:12-cv-06950 (GW) (JCx)

Hon. George H. Wu

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

**PUBLIC VERSION**

Courtroom:        10
Hearing Date:     December 6, 2012
Hearing Time:     8:30 a.m.

Fact Discovery Cutoff:    April 30, 2013
Expert Discovery Cutoff:  May 28, 2013
Pretrial Conference:      July 25, 2013
Trial:                    August 6, 2013

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................1

II.   STATEMENT OF FACTS ......................................................4

    A.   Plaintiffs And Their Copyrighted Programming......................4

    B.   FilmOnX Is An Unauthorized Internet Streaming Service......................5

    C.   FilmOnX Is A Reincarnation Of An Unauthorized Streaming Service Enjoined Since 2010 And Its "Aereo" Technology Defense Is Specious And Unsupported By The Facts ............................7

III.  PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ...................................................................10

    A.   Plaintiffs Are Likely To Succeed On The Merits.................................11

    B.   Plaintiffs Will Suffer Irreparable Harm Absent An Injunction.............16

    C.   The Balance Of Harms Tips Decidedly In Favor Of An Injunction ...................................................................23

    D.   The Public Interest Favors An Injunction ............................................24

IV.   CONCLUSION ...................................................................25

# <u>Table of Authorities</u>

**Page(s)**

CASES

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001).............................................................................11

*ABC v. Aereo, Inc.*,
  2012 WL 2848158 (S.D.N.Y. July 11, 2012) ......................................................8

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)..............................................................................11

*Cadence Design Sys., Inc. v. Avant! Corp.*,
  125 F.3d 824 (9th Cir. 1997)................................................................................23

*Cartoon Network, LP LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008)...................................................................................2

*CBS Broad., Inc. v. FilmOn.com, Inc.*,
  Case No. 10-cv-07532-NRB ..................................................................................8

*eBay, Inc. v. Bidder's Edge, Inc.*,
  100 F. Supp. 2d 1058 (N.D. Cal. 2000)................................................................22

*EchoStar Satellite L.L.C .v. F.C.C.*,
  457 F.3d 31 (D.C. Cir. 2006) ...............................................................................11

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003)...............................................................................................24

*Gunther v. Washington County*,
  623 F.2d 1303 (9th Cir. 1979)...............................................................................15

*Live Nation Motor Sports, Inc. v. Davis*,
  No. 3:06-CV-276-L, 2007 WL 79311 (N.D. Tex. Jan. 9, 2007) .......................13

*Lynchval Sys., Inc. v. Chicago Consulting Actuaries, Inc.*,
  No. 95-C-1490, 1998 WL 151814 (N.D. Ill., Mar. 27, 1998) ..........................16

*Metro Goldwyn Mayer Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007)................................................................16

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
  16 F.3d 1032 (9th Cir. 1994).................................................................................24

*Rosen Entm't Sys., LP v. Eiger Vision*,
    343 F. Supp. 2d 908 (C.D. Cal. 2004)............................................................22

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010).................................................................16, 23

*Satellite Broad. And Comm. Ass'n v. F.C.C.*,
    275 F.3d 337 (4th Cir. 2001)...................................................................25

*Triad Sys. Corp. v. Southeast Express Co.*,
    64 F.3d 1330 (9th Cir. 1995)....................................................................23

*Twentieth Century Fox Film Corp. v. iCraveTV*,
    2000 WL 25989 (W.D. Pa. Feb. 8, 2000)........................................ 11, 12, 13, 14

*United States v. Bennett*,
    363 F.3d 947 (9th Cir. 2004)....................................................................16

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
    192 F. Supp. 2d 321, 332 (D.N.J. 2002)
    *aff'd on other grounds*, 342 F.3d 191 (3d Cir. 2003)........................................13

*Warner Bros. Entm't Inc. v. WTV Systems, Inc.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ...................................................passim

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................10

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275 (2nd Cir. 2012)...............................................................passim

**STATUTES**

17 U.S.C. § 101 .............................................................................. 2, 12, 13, 16

17 U.S.C. § 106 .........................................................................................11, 12

17 U.S.C. § 504(c)(2)..........................................................................................23

47 U.S.C. § 325(a) .............................................................................................5

**OTHER AUTHORITIES**

H.R. Rep. 94-1476 at 64,
    *reprinted in* 1976 U.S.C.C.A.N. at 5678 ...................................................13

Preston Gralla, <u>How The Internet Works</u> (7th ed. 2004) ........................................5

Plaintiffs[1] respectfully submit this memorandum of points and authorities in support of their motion for a preliminary injunction prohibiting Defendants Aereokiller LLC, BarryDriller, Inc., and Barry Driller Content Systems Plc (collectively, "Aereokiller" or "Defendants") from retransmitting Plaintiffs' over-the-air broadcasts via the Internet, web applications, portable devices, or any other method without Plaintiffs' authorization in violation of the Copyright Act.

## I. INTRODUCTION

This Motion does not present new or difficult legal issues: Courts have repeatedly enjoined unlicensed commercial services that stream copyrighted works, including broadcast television programming, over the Internet. While an individual can receive broadcast television over the airwaves for free, a business such as Aereokiller's that retransmits television broadcasts over the Internet is engaged in a "public performance" of those television programs under the Copyright Act. Because Plaintiffs have the exclusive right to publicly perform their works and Aereokiller has no license from any network to retransmit their programs over the Internet, Aereokiller should be enjoined from infringing Plaintiffs' copyrights through its FilmOnX website and service, or otherwise.

Indeed, Judge Buchwald in the Southern District of New York entered a temporary restraining order in 2010 which was converted to a permanent injunction on August 9, 2012 that permanently enjoined Aereokiller's sister company and part owner, FilmOn.com Inc., from streaming over the Internet the broadcasts of the four television networks through the FilmOn service and website.

---

[1] Plaintiffs consist of Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, and Fox Broadcasting Company, Inc. (collectively, "Fox") in the above-captioned action, along with NBCUniversal Media, LLC, Universal Network Television, LLC, Open 4 Business Productions LLC, NBC Subsidiary (KNBC-TV) LLC, Telemundo Network Group LLC, WNJU-TV Broadcasting LLC, American Broadcasting Companies, Inc., ABC Holding Company Inc., Disney Enterprises, Inc., CBS Broadcasting Inc., CBS Studios Inc. and Big Ticket Television, Inc. in the related *NBCUniversal* action. An identical Motion is being filed in each action.

FilmOnX is simply a reincarnation of the enjoined FilmOn service.  Given the clear dictates of the Copyright Act, and the existing injunction, the Court may wonder what possesses Aereokiller to believe its FilmOnX service should not be enjoined while the virtually identical FilmOn service was permanently enjoined just months ago.  According to Aereokiller (███████████████████████), it should not be enjoined because its technology is supposedly like the competing Aereo service and a different District Court Judge in the Southern District of New York refused to preliminarily enjoin that service.[2]

Aereokiller's claim that its purported attempt to emulate the technology used by Aereo exempts it from the Copyright Act in this District fails for multiple reasons.  *First,* a decision by another District Court in a different circuit applying the *Cablevision* case,[3] which is not controlling, to deny a preliminary injunction for a different service on a different record is irrelevant.  This is especially true since Aereo has limited its service to the greater New York area specifically to stay within the confines of the reach of the *Cablevision* decision.  *Second*, and more fundamentally, the Copyright Act is expressly technology agnostic and prohibits the public performance of a work by a transmission to the public "by means of any device or process."  17 U.S.C. § 101.  In other words, Congress intended that a service such as Aereokiller's that makes Plaintiffs' copyrighted works available to its subscribers must have a license  irrespective of any technological gimmickry to deliver the programming to its subscribers.  *Third*, and not surprisingly, the District Court's decision in *Aereo* is an outlier among several decisions enjoining commercial services that retransmit copyrighted works over the Internet.  Indeed, Aereokiller's sister company was enjoined in 2010 and stipulated to entry of a

---

[2]   As Plaintiffs believe their motion for a preliminary injunction against Aereo was incorrectly decided, they have filed an expedited appeal of the *Aereo* decision, which is set for oral argument on November 30, 2012.

[3] *Cartoon Network, LP LLLP v. CSC Holdings, Inc.*("*Cablevision*"), 536 F.3d 121 (2d Cir. 2008).

consent judgment and permanent injunction of the FilmOn service after the *Aereo* decision.  *Fourth*, Aereokiller's claim fails as a factual matter and must be viewed with great skepticism since ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████.  Aereokiller cannot have it both ways.  It cannot assert an "Aereo" defense (on which it bears the burden of proof) while withholding the technical discovery necessary to test that defense.

Aereokiller's copyright infringement must be enjoined to prevent irreparable injury to Plaintiffs.  As content owners and broadcasters, Plaintiffs' businesses depend on their ability to control where, when and how their programming is distributed to consumers.  Aereokiller's unauthorized streaming of Plaintiffs' programming rips that control from Plaintiffs, threatens their core business models, destroys their leverage in critical distribution negotiations, harms their ability to expand into new markets, and interferes with Plaintiffs' goodwill with licensed distributors and advertisers.

The harms inflicted by Aereokiller are inherently difficult to measure and cannot be remedied by an award of damages, especially because Aereokiller may never be able to pay the significant statutory damages authorized by the Copyright Act for what will amount to willful infringement of thousands of separate works.  Moreover, unless enjoined, Defendants' model for infringement will be imitated by others, further exacerbating the harm to Plaintiffs.  These exact harms formed the basis for courts in the Ninth Circuit to enjoin unauthorized Internet streaming of entertainment programming.[4]  And, the Second Circuit recently reaffirmed this

---

[4] *See*, *e.g.*, *WTV Systems*, 824 F. Supp. 2d at1012-14 (analyzing numerous forms of irreparable harm threatened by unauthorized Internet transmissions of

conclusion in its detailed analysis of the irreparable harms caused by unauthorized Internet streaming of Plaintiffs' broadcasts such as those at issue here.[5]

## II.     STATEMENT OF FACTS

### A. Plaintiffs And Their Copyrighted Programming

Plaintiffs are companies that, among other things, produce and license the distribution of television programs and other copyrighted works that appear on the Fox, NBC, ABC, and CBS television networks.  Plaintiffs invest significant resources in the development, acquisition and production of this programming, which includes such popular programs as *Glee* (FOX), *The Office* (NBC), *Grey's Anatomy* (ABC), and *The Good Wife* (CBS) that are broadcast on network-affiliated television stations.  Plaintiffs own the copyrights in these and other programs that are broadcast on their respective television networks.  Declaration of Sherry Brennan ("Brennan Decl."), ¶ 2; *see* Declaration of Marsha Reed ("Reed Decl."), ¶¶ 4-5, Exs. 1, 2; Declaration of Carly Seabrook ("Seabrook Decl."), ¶ 2, Exs. 1, 2; Declaration of Rebecca Borden ("Borden Decl."), ¶¶ 4-5, Exs. 1, 2. Plaintiffs also own and operate numerous local broadcast television stations that are actively engaged in the distribution of their programs throughout the United States.  Brennan Decl., ¶¶ 3-4.

Plaintiffs' copyrighted television programming is offered directly to the public free of charge via over-the-air broadcasts.  The latest reports reflect that nearly 54 million Americans rely on over-the-air broadcasts (not cable or satellite) to receive television.  *Id.* ¶ 3, Ex. B.

Plaintiffs' broadcasts are also distributed via cable and satellite by various cable television companies and satellite television services, such as Time Warner

---

plaintiffs' movies).

[5]     *WPIX, Inc. v. ivi, Inc.* (*"ivi"*), 691 F. 3d 275, 85-87 (2d Cir. 2012) (describing the litany of irreparable harms caused by unlicensed Internet retransmissions of broadcast television).

Cable, DirecTV, and Comcast, pursuant to retransmission consent agreements.  *Id.* ¶ 4.  Under federal communications law, cable and satellite television providers must obtain a broadcast network's consent to retransmit the network's signal to subscribers (*see* 47 U.S.C. § 325(a)), which they do through negotiations with Plaintiffs.

Plaintiffs have also entered into other arrangements regarding the distribution of their programming over different media (*e.g.*, the Internet or digital downloads) and/or on a delayed basis.  *Id.* ¶¶ 18-19.  For example, many of the Plaintiffs license their content on a time-delayed basis to companies such as Hulu (in which some Plaintiffs have an ownership interest) for distribution on Hulu.com and Apple for distribution through iTunes.  *Id.* ¶ 19.  Certain Plaintiffs and affiliated companies also offer their own mobile TV offerings, including Dyle.tv, which is part of a joint venture between NBCUniversal and Fox, and ABC's soon-to-be launched "Watch" services.  *Id.* ¶ 22.

## B. FilmOnX Is An Unauthorized Internet Streaming Service

Plaintiffs have not granted Aereokiller any license to their copyrighted programming.  Brennan Decl., ¶ 6.  Nevertheless, on or about August 7, 2012, Aereokiller began streaming over the Internet[6] the local television stations affiliated with the Fox, NBC, ABC, and CBS networks -- and Plaintiffs' copyrighted programming on those stations -- in the Los Angeles, Chicago, New York and Minneapolis markets.  Declaration of Julie Shepard ("Shepard Decl."), ¶ 2*; Declaration of Samuel Bahun ("Bahun Decl."), ¶¶ 3-8.  Sometime in September 2012, Defendants expanded their service to include streaming the local broadcast channels from Dallas and San Francisco.  Shepard Decl., ¶ 2.

---

[6]  As explained by the *ivi* court, "'[s]treaming' generally involves compressing a file to a size small enough to be transmitted over the Internet and then allowing the receiving computer to start playing packets of the file while the remaining packets are being transmitted."  *ivi*, 691 F.3d at 277, n.1, citing Preston Galla, <u>How the Internet Works</u>, 229-31 (7th ed. 2004).

Aereokiller's streaming service was originally made available to the public at www.barrydriller.com.  After Aereokiller lost a legal battle with media executive Barry Diller over the use of the "Barry Driller" name,[7] Aereokiller changed its service to "FilmOnX" and began redirecting subscribers from www.barrydriller.com to www.filmonx.com, where it continues to operate the infringing service.  *See id.* ¶ 2, Ex. M (257:25-258:15)*; Barry Diller v. Barry Driller Content Systems, Plc.*, Case No. 2:12-CV-7200-ABC-JC, Dkt. Nos. 11, 24 & 25*.*  In the latter half of October, notwithstanding the pendency of this Action, Aereokiller again expanded its infringing service and began making Plaintiffs' local broadcasts available over the www.filmon.com website, in addition to www.filmonx.com.  Shepard Decl. ¶ 2, Ex. M (257:25-258:15); Bahun Decl. at ¶ 7.

Aereokiller also started retransmitting Plaintiffs' local broadcast via Internet "apps" compatible with iPhones, Android phones, Facebook and Microsoft's Windows 8.  Shepard Decl., ¶¶ 2, 8, 17, Exs. C, D, K.  Aereokiller's widened distribution web threatens to substantially expand its current unauthorized distribution of Plaintiffs' programming by making Aereokiller's infringing service available to tens of millions of more users.  *See*, Section III.C., *infra*.

Aereokiller derives financial benefit from the retransmission of Plaintiffs' over-the-air broadcasts in several ways.  First, it charges fees to its subscribers (1) to receive the unauthorized retransmissions of network and local programming on the local Fox, NBC, ABC and CBS affiliates, as well as other local stations, in High Definition to be watched live and (2) to copy Plaintiffs' programming for later viewing.  Shepard Decl., ¶¶ 11-12, Exs. F, G, M (43:10-18).  And, while

---

[7]   Barry Diller is a well-known media executive and investor in Aereo, another unauthorized Internet retransmission service that Plaintiffs have sued in New York.  Mr. Diller sued Aereokiller in the Central District of California for misuse of his name shortly after launch of the barrydriller.com website.  Defendants have been preliminarily enjoined from using "Barry Driller" or any close iteration thereof.  *Barry Diller v. Barry Driller Content Systems, Plc.*, Case No. 2:12-cv-7200 ABC (JC), Dkt. Nos. 11, 24 & 25.

Aereokiller does not charge users to watch Plaintiffs' broadcasts live in standard definition, it commercially capitalizes on such retransmissions through advertising. *Id.* ¶¶ 13-16, Exs. H, I, J.  Aereokiller airs 10-30 second advertising spots that a FilmOnX user will see immediately after they select one of Plaintiffs' channels. The user will first be forced to watch the advertising before Plaintiffs' programming appears.  *Id.* ¶ 14, Ex. H and Ex. M (43:22- 44:2).  *See also*, Brennan Decl., ¶ 23.  Advertising companies pay Defendants, not Plaintiffs, for these advertisement spots.  Brennan Decl., ¶ 23.  Aereokiller also advertises its own programs and affiliated services (*e.g., Situation TV, Battle CAM Community TV, Natalie Nunn Live*, FilmOn.tv) through banner ads strategically placed directly above its unauthorized display of Plaintiffs' broadcasts.  Shepard Decl., ¶ 15, Ex. I. Finally, in an effort to trade unfairly on an unlicensed association with Plaintiffs' popular programming, Aereokiller prominently displays its "FilmOnX" logo in a corner of the screen on which Plaintiffs' programs are exhibited.  *Id.*  ¶ 16, Ex. I, J.

### C. FilmOnX Is A Reincarnation Of An Unauthorized Streaming Service Enjoined Since 2010 And Its "Aereo" Technology Defense Is Specious And Unsupported By The Facts

Aereokiller appeared for a limited 30(b)(6) deposition on November 1, 2012. Shepard Decl., ¶ 19.  During the course of the deposition, it became clear that Aereokiller is hiding the ball from Plaintiffs, and ultimately this Court.



Shepard Decl.,¶ 19, Ex. M (60:4-61:1).  In September 2010, one of Mr. David's companies launched FilmOn -- another website that also streamed Plaintiffs' over-the-air broadcasts without permission.  Plaintiffs immediately sued FilmOn in the United States District Court for the Southern District of New York and won a temporary restraining order, enjoining its infringing retransmissions.  *See CBS Broad., Inc. v. FilmOn.com, Inc. ("FilmOn")*, Case No. 1:10-cv-7532-NRB, Dkt. No. 8 (Nov. 22, 2010); Shepard Decl., Ex. S.  The case was resolved by way of a consent judgment, entered on August 8, 2012, that permanently required FilmOn to stop streaming Plaintiffs' copyrighted programming (the "FilmOn Injunction").  *Id.* Ex. M (234:16-235:5, Depo. Ex. 7).

Within a day of the entry of the FilmOn Injunction, Aereokiller launched www.barrydriller.com to stream the network broadcasts over the Internet.  *Id.*; Shepard Decl., ¶ 2.  Aereokiller endeavored to publicly associate itself as closely as possible with a different Internet streaming service called Aereo that is located in Brooklyn to give the false impression that Defendants' Internet streaming service is an analog to Aereo and employs the same technology.  Aereo uses antenna boards with hundreds of tiny antennas that capture Plaintiffs' over-the-air broadcasts and the resulting digital signals are then routed through a hard drive with DVR functionality to "play back" the broadcasts over the Internet to Aereo subscribers.  Aereokiller wants to be associated with Aereo and its technology because a court in the Southern District of New York declined in July 2012 to preliminarily enjoin Aereo's unauthorized streaming service because of the technology Aereo employs even though the court recognized the irreparable harm this was causing the broadcast companies, who are Plaintiffs here.  *See ABC v. Aereo, Inc. ("Aereo")*, 2012 WL 2848158 (S.D. N.Y. July 11, 2012), *appeal pending*.

To create the association with Aereo, Aereokiller not only chose a corporate name incorporating "Aereo," but also described its service as employing "tons" of

antennas that are "so tiny" that one will "fit on the tip of your finger" with servers in a "Brooklyn facility."  Shepard Decl., Ex. M (86:20-87:19, Ex. 1).[8]  Aereokiller also chose to launch its service using the domain name BarryDriller.com, a play on the name of Barry Diller, a well-known backer of Aereo, and also displayed the corporate names BarryDriller Inc. and Barry Driller Content Systems Plc on Aereokiller's website.  *Id.*[9]  Aereokiller only started using filmonx.com after being enjoined from using barrydriller.com.  *Id.*

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.  *Id.* (67:16-69:14); Bahun Decl., ¶ 7.[10]

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■,[11]

[8] ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.  *Id.* (86:13-87:17, Depo. Ex. 1).

[9] ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.  *Id.* (53:3-16).

[10] When questioned during the 30(b)(6) deposition ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.  *See* Shepard Decl., Ex. M (234:25-235:5, 243:6-244:16, Ex 7).

[11]  As this Court is aware, Aereokiller has resisted efforts of Plaintiffs to take discovery regarding Aereokiller's technology.  Shepard Decl., ¶ 20.  In response to requests for expedited discovery, Aereokiller opposed Plaintiffs' technology discovery requests, asserting that such discovery was "not relevant" to a preliminary injunction motion  *Id.* ¶ 20. This Court declined to order expedited technology related discovery because it was not clear that an Aereo defense would be raised by Aereokiller *or* that "such an opposition had a colorable chance of convincing the Court of its merit in the face of the unauthorized conduct that gave rise to this litigation."  Dkt. No. 33(Fox action), Dkt. No. 29 (NBCUniversal action).  Further, even though Aereokiller later stipulated that it would respond (subject to its objections) to all of Plaintiffs' expedited discovery requests, Aereokiller refused to provide any documents that would reveal how its technology actually functions, how many tiny antennas it purportedly has deployed, and where they are located.  Shepard Decl., ¶ 20, Ex. N.  Plaintiffs warned Aereokiller that if no technology documents were provided, they would move to exclude them if submitted in opposition to a preliminary injunction motion. Shepard Decl., ¶¶ 20-22 To date, no technology documents have been provided.  *Id.*  While Plaintiffs believe that even if FilmOnX adopted the Aereo technology it would still be



*Id*. (117:25-118:11, 207:5-213:3).

. *Id*. (25:20-26:12, 27:15-28:23).

.

. *Id*. (96:10-100:1, 101:19-102:6, 106:3-17, 108:20-109:19, 111:7-12).

Aereokiller's refusal to provide the details of its technology reveals that its "Aereo-like" defense is pure fabrication.  In any event, employing Aereo's technology is no defense to a copyright infringement claim.  As with the FilmOn entities and filmon.com, Aereokiller and FilmOnX are engaged in unauthorized retransmissions of Plaintiffs' copyrighted works and should be enjoined.

## III.   PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

Plaintiffs may obtain a preliminary injunction by establishing that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def.*

illegally publicly performing their copyrighted works, Defendants clearly believe their sole excuse to civil copyright liability is the architecture of their technology. Thus, it is telling that Defendants still refuse to provide, under oath, the information that would verify if this is true.

*Council*, *Inc.,* 555 U.S. 7, 20 (2008).  Alternatively, an injunction also should issue if Plaintiffs show "serious questions going to the merits" and a "balance of hardships that tips sharply towards the plaintiff[s]," so long as Plaintiffs "also show[] that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *WTV Systems*, 824 F. Supp. 2d at 1008.

### A. Plaintiffs Are Likely To Succeed On The Merits

To establish copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) violation by the defendant of any of one of the five exclusive rights granted to copyright owners under 17 U.S.C. § 106.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001); *WTV Systems*, 824 F. Supp. 2d at 1008.  Plaintiffs easily satisfy both of these requirements.  *First*, Plaintiffs own the copyrights to the programs that Defendants are unlawfully streaming over FilmOnX.  *See* Brennan Decl., Ex. A; Reed Decl., Ex. 2; Borden Decl., Ex. 2; Seabrook Decl., ¶ 2, Ex. 2.  *Second*, as explained below, Defendants are violating Plaintiffs' exclusive right to perform their copyrighted works publicly and to authorize others to do so.  *See* 17 U.S.C. § 106(4).

The Transmit Clause of the Copyright Act gives copyright owners such as the broadcast company plaintiffs here "exclusive rights . . . to authorize the public display of [their] copyrighted content, including the retransmission of [their] broadcast signal[s]."  *ivi*, 691 F.3d at 278 (quoting *EchoStar Satellite L.L.C. v. F.C.C.*, 457 F.3d 31, 33 (D.C. Cir. 2006)) (alterations and ellipses in original; internal quotation marks omitted); *accord*, *WTV Systems*, 824 F. Supp. 2d at 1008-10; *Twentieth Century Fox Film Corp. v. iCraveTV*  ("*iCraveTV*"), 2000 WL 25989, at *7 (W.D. Pa. Feb. 8, 2000).  As the *ivi* court recognized, retransmitting over-the-air television broadcasts via the Internet to subscribers, as Defendants do, constitutes a "public performance" that must be licensed by the copyright owners and constitutes infringement if it is not.  *ivi*, 691 F.3d at 278.

Under the Transmit Clause, a party publicly performs a work when it (1) transmits a performance of the work (2) to the public (3) by means of any device or process – regardless of "whether the members of the public … receive it in the same place or in separate places and at the same time or at different times."  17 U.S.C. § 101*; see also*, *WTV Systems*, 824 F. Supp. 2d at 1009-1010.  By streaming Plaintiffs' broadcasts over FilmOnX, Defendants (1) retransmit copyrighted programming over the Internet (2) to any member of the public who wishes to use or subscribe to their service (3) by means of Defendants' system for capturing over-the-air broadcasts and streaming those broadcasts over the Internet to subscribers.  Defendants' unauthorized retransmissions of Plaintiffs' television broadcasts therefore violate Plaintiffs' public performance rights, even if different viewers receive the transmission in separate places and at different times.  *See*, *e.g., WTV Systems*, 824 F. Supp. 2d at 1008-09; *iCraveTV*, 2000 WL 25989, at *7; *accord, ivi*, 691 F.3d at 279, 284-85.

The Copyright Act also is clear that a work is performed publicly (thus requiring a license from the copyright holder) if a performance of the work is transmitted to the public "by means of any device or process."  17 U.S.C. § 101. For the purpose of determining whether a performance is to the public, it does not matter whether the transmitter uses a process that involves one antenna or multiple antennas or transmits from a master copy or unique copies.  The fact that Congress intended to capture all possible technologies within the definition of public performance is underscored by the statute's definition of "device or process" which includes one "now known or later developed."  *Id.*  As Congress made clear:

> The definition of "transmit" . . . is broad enough to include *all conceivable forms and combinations of wires and wireless communications media*, including but by no means limited to radio and television broadcasting as we know them.  Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and *if the*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*transmission reaches the public in any form*, the case comes within the scope of [the statute].

H.R. Rep. 94-1476 at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678 (emphasis added).

The proposition that the unauthorized retransmission of television broadcasts over the Internet infringes the public performance rights of copyright holders is hardly novel.  As far back as 2000, the court in *iCraveTV* considered a challenge to an Internet service that captured over-the-air television broadcasts, converted the signals into computerized data, and streamed copyrighted programming to subscribers over the defendant's website.  2000 WL 25989, at *2.  Granting a preliminary injunction, the court held that the plaintiffs were likely to succeed on their copyright claims because defendants were "unlawfully publicly performing plaintiffs' copyrighted works … by transmitting (through use of 'streaming' technology) performances of the works to the public by means of the telephone lines and computers that make up the Internet."  *Id.* at *7.  Defendants conduct here is indistinguishable from the infringing conduct by iCraveTV.

Over the 12 years between *iCraveTV* and the near-identical holding in *ivi*, courts applying the Transmit Clause in the online context have repeatedly reaffirmed the conclusion that Internet transmissions and retransmissions of protected works to multiple individuals – even in different places and at different times – are public performances that require the consent of the copyright owners. *See FilmOn.com*, No. 1:10-cv-7532-NRB, Dkt. No. 8 (Nov. 22, 2010) (TRO enjoining Internet retransmissions of Plaintiffs' over-the-air television broadcasts as unauthorized public performances); *Live Nation Motor Sports, Inc. v. Davis*, No. 3:06-CV-276-L, 2007 WL 79311 (N.D. Tex. Jan. 9, 2007) (audio webcasts of Supercross event infringe the public performance right); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 332 (D.N.J. 2002) (transmissions of video clips from motion pictures over the Internet are public

performances), *aff'd on other grounds*, 342 F.3d 191 (3d Cir. 2003).  The Copyright Office shares the view that performances of works over the Internet are to the public and must be licensed by the copyright owner.  *See ivi* at 283-84.

These basic principles were reaffirmed within the Ninth Circuit as recently as last year when the *WTV Systems* court held that unauthorized transmission of copyrighted videos over the Internet violates the copyright holders' public performance rights.  824 F. Supp. 2d at 1008.  In *WTV Systems*, the defendants provided a DVD "rental service" called Zediva over the Internet.  The defendants purchased hundreds of DVDs and DVD players.  *Id*. at 1006-07.  Upon the customer's request, the defendants would assign a DVD player to the customer, insert a DVD of the movie requested, convert the signal to a form suitable for streaming over the Internet, and transmit the performance via the Internet to the customer.  *Id*. at 1007.  The defendants tried to claim that they were merely a rental service and were not transmitting a performance to the public via their Internet site.  The *WTV Systems* court flatly rejected this and held that:  "Defendants are violating Plaintiffs' exclusive right to publicly perform their Copyrighted Works by transmitting those Works to the public over the Internet, without a license or Plaintiffs' permission, through the use of Zediva's service."  *Id*. at 1008.

Like the defendants in *iCraveTV, ivi* and *FilmOn.com*, Defendants in this case are capturing Plaintiffs' over-the-air broadcasts and copyrighted programming.  And, like the defendants in *iCrave*, *WTV Systems, ivi*, and *FilmOn.com*, Defendants are retransmitting Plaintiffs' programming to the public over the Internet without the copyright holders' authorization.  Accordingly, like the defendants in these cases*,* Defendants should be enjoined because Plaintiffs are likely to succeed on the merits of their claim that the FilmOnX service violates Plaintiffs' public performance rights under Section 106 of the Copyright Act.  Indeed, this is particularly true because, as explained above, FilmOnX appears to be just a reincarnation of the www.filmon.com website enjoined in *FilmOn.com*.

14

Aereokiller cannot avoid an injunction with its purported attempt to replicate the Aereo service.  This is especially true since Aereo has limited its service to the greater New York area specifically to stay within the confines of the reach of the *Cablevision* decision, while FilmOnX is streaming in Los Angeles and San Francisco, among other places.  Neither the Second Circuit's decision in *Cablevision*, nor the District Court's decision in *Aereo* reluctantly following *Cablevision,* is controlling here.  *See, e.g., Gunther v. Washington County*, 623 F.2d 1303, 1319 (9th Cir. 1979) (noting that the court is "bound only by decisions rendered in this circuit.").  Indeed, the District Court's decision in *Aereo* is an outlier and runs counter to the numerous cases cited above and fundamental copyright law.  In particular, *Aereo* is inconsistent with this District's ruling in *WTV Systems*, which held that assignment of a dedicated DVD player to a user and the subsequent transmission of the video stream from that DVD player to a user over the Internet violated the public performance right.  *WTV Systems*, 824 F. Supp. 2d at 1008.  Aereokiller's alleged use of individual antennas for each of its users substantively is no different than the dedicated DVD players at issue in *WTV Systems*, and should be treated the same under the Copyright Act.

Further, as noted above, the Copyright Act is expressly technology agnostic.  It prohibits the public performance of a work by a transmission to the public "*by means of any device or process*."  17 U.S.C. § 101 (emphasis added).  By these words, Congress intended that a service such as Aereokiller's that makes another's copyrighted works available to its subscribers must have a license to do so, irrespective of the method by which programming is made available.  Whether FilmOnX uses one antenna or many, it delivers a service indistinguishable from those enjoined in *ivi* and *FilmOn* and, like the service in *WTV Systems*, uses the Internet to publicly perform Plaintiffs' copyrighted content.

Finally, Aereokiller's claim that it is "Aereo-like" must be viewed with great skepticism and accorded no weight given ███████████████████████████

15

1

2

3                                                          .  Aereokiller cannot invoke a technical defense, on which it

4    bears the burden of proof, based entirely on information within its exclusive

5    control, while withholding the technical data necessary to test the applicability of

6    that defense.[12]  Regardless, because the Transmit Clause is technology agnostic,

7    *Aereo* provides no defense at all.

8        **B. Plaintiffs Will Suffer Irreparable Harm Absent An Injunction**

9            Plaintiffs are broadcasters and copyright owners, whose businesses depend

10   on their "exclusive right to decide when, where, to whom and for how much they

11   will authorize transmission of their [c]opyrighted [programming] to the public."

12   *WTV Systems*, 824 F. Supp. 2d at 1012.  Plaintiffs possess a "property interest in

13   the copyrighted material" and will suffer harm to that "legal interest" that "cannot

14   be remedied after a final adjudication," if Defendants' unauthorized retransmission

15   of their broadcasts is not enjoined.  *Salinger v. Colting*, 607 F.3d 68, 81 & n.9 (2d

16   Cir. 2010); *see Metro Goldwyn Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp.

17   2d 1197, 1210 (C.D. Cal. 2007).

18           In copyright cases, courts have held that irreparable harm is established

19   where an infringing defendant's activities threaten to impair a copyright owner's

20   control over its copyrighted works, threaten the goodwill and business reputation

21   of the plaintiff, or threaten to cause loss of business or business opportunities.  *See*,

22   *e.g.*, *ivi*, 691 F.3d at 285-87; *WTV Systems*, 824 F. Supp. 2d at 1012-13.  The *ivi*

23

24   [12]  Aereokiller also cannot rely on conclusory and self-serving testimony while
     withholding the actual technical data necessary to prove or disprove Mr. David's

25   assertions.  Such testimony

26                                        is inadmissible.  *See United States v. Bennett*, 363 F.3d
     947, 953 (9th Cir. 2004) (best evidence rule barred testimony regarding GPS data

27   where "the government did not produce the GPS itself -- or a printout or other
     representation of such data"); *accord*, *Lynchval Sys., Inc. v. Chicago Consulting*

28   *Actuaries, Inc.*, No. 95-C-1490, 1998 WL 151814, at *6 (N.D. Ill., Mar. 27, 1998) .

and *WTV Systems* decisions, in particular, described the multiple, irreparable harms caused by unlicensed streaming of copyrighted television and video programming over the Internet.  As the accompanying declaration of Sherry Brennan further establishes, FilmOnX's unauthorized Internet streaming of Plaintiffs' broadcasts threatens to damage Plaintiffs' intellectual property and their businesses in at least the following ways recognized by those case as irreparable harm:

  *Damaging Plaintiffs' Ability to Negotiate Retransmission Consent Agreements.*  Defendants' unauthorized streaming of Plaintiff's television programming over the Internet threatens to damage Plaintiffs' ability to negotiate favorable retransmission consent agreements with cable, satellite and telecommunications providers, such as Time Warner Cable, DirecTV and Verizon, who legitimately retransmit Plaintiffs' broadcasts.  *See ivi*, 691 F.3d at 285; *see also,* Brennan Decl., ¶¶ 15-17.

  Revenues from retransmission consent licensing have become increasingly important to the broadcast industry, and are used to fund the development and acquisition of broadcast programming.  *ivi*, 691 F.3d at 285; *see also,* Brennan Decl., ¶ 15.  Unauthorized services like FilmOnX threaten to undermine the value of these retransmission rights because they steal Plaintiffs' live programming and retransmit it at the same time as cable and satellite companies that pay Plaintiffs for those rights, which could lead these companies to demand concessions if free-riders like Defendants exploit them without paying.[13]  *ivi*, 691 F.3d at 285;

---

[13] ████████████████████████████████████████████████████████████████
████████████.  *See* Shepard Decl., Ex. M (251:18-25).  However, such a restriction is solely in its control and could be lifted at Aereokiller's whim.  If it were, Plaintiffs' broadcasts that Aereokiller is capturing in six local markets would become available nationally.  As a result, a person in Seattle, for example, would be able to use FilmOnX to view a program broadcast on a New York station hours ahead of the same program's scheduled airing on one of the Plaintiffs' local Seattle channels.  The *ivi* court found the interference with the time restrictions in plaintiffs' licenses to be another factor that undermined their negotiations and relationships with licensees and advertisers and diminished the value of the their programming, thereby causing irreparable harm. 691 F.3d at 285-86.

*accord, WTV Systems*, 824 F.Supp. 1003; *see also,* Brennan Decl., ¶¶ 15-17.

In addition, the harm to Plaintiffs' ability to negotiate retransmission consent contracts is compounded because Defendants' service is designed to poach viewers away from authorized cable and satellite companies.  *See ivi*, 691 F.3d at 285-86. These licensed companies may demand concessions from Plaintiffs to make up for the loss of viewership to unauthorized Internet retransmitters.  *See* Brennan Decl., ¶¶ 15-17.  Moreover, Defendants are able to offer their services at lower prices than the cable and satellite companies, ███████████████████ (Shepard Decl., Ex. M (184:14-19, Depo. Ex. 4)), because Defendants do not pay licensing fees or incur costs necessary to comply with quality and security controls that Plaintiffs' require of their licensees.  *See WTV Systems*, 824 F. Supp. at 1013. In this way, Defendants' bootleg service harms Plaintiffs' legitimate licensees and damages Plaintiffs' goodwill with those licensees, which further impairs Plaintiffs' positions in retransmission consent negotiations.  *See WTV Systems*, 824 F. Supp. 1012-13 (unlicensed Internet streaming of copyrighted videos "jeopardized the continued existence of Plaintiffs' licensees' businesses" and harm plaintiffs' goodwill with its licensees).  *See also,* Brennan Decl., ¶¶ 15-17.

***Interference With Lawful Internet Television Distribution.***  FilmOnX also threatens to interfere with Plaintiffs' ability to develop a successful and lawful market for Internet distribution of television programming.  Plaintiffs license a variety of entities, including Hulu (which licenses content from Fox, NBC and ABC for distribution over Hulu.com) and Apple (which licenses content from all four networks for distribution through iTunes), to distribute programming over the Internet on a time-delayed basis.  Brennan Decl., ¶¶ 18-20.  Defendants' unauthorized streaming of Plaintiffs' content over FilmOnX, before these licensees are allowed to make the programming available, could undercut the value of the programming to these legitimate services, represents unfair competition with these legitimate services, damages Plaintiffs' goodwill with these licensees, and puts

their licensing relationships at risk. *WTV Systems*, 824 F. Supp. 1012-13. Moreover, the presence of Defendants' service in this nascent market threatens the development and acceptance of those services by confusing consumers, including about when and whether payment is required to watch Plaintiffs' programs on the Internet. Unless enjoined, Aereokiller will create incorrect, but lasting impressions about what constitutes lawful Internet distribution of Plaintiffs' broadcasts. *Id.*

*Undermining Plaintiffs' Own Websites.* FilmOnX's unauthorized retransmission includes a large volume of programming that Plaintiffs themselves make available on their own websites and through other Internet and mobile television offerings. All four networks maintain websites over which they offer certain programming. In addition, Fox and NBC Universal have, as part of a joint venture (with others) called Dyle.tv, launched their own mobile television application. Brennan Decl., ¶¶ 18, 22. ABC's affiliated companies make their programming available through the "Watch" Internet services and ABC will be doing the same. *See id.* By stealing Plaintiffs' copyrighted programming and using it to enter the Internet streaming market in direct competition with Plaintiffs, Defendants threaten to undermine Plaintiffs' choices about how and when to show their programming on the Internet, their opportunities to engage in marketing and demographic research, and to develop closer connections with viewers, and the substantial investments they have made in the development of this emerging market. *Id.* ¶¶ 18, 21-23. Courts have recognized all of these consequences as irreparable harms. *See WTV Systems*, 824 F. Supp. at 1014; *accord, ivi*, 691 F.3d at 285-86.

*Destruction of Value in Network Advertising.* FilmOnX also threatens to undermine Plaintiffs' positions in negotiations with television advertisers by siphoning viewers from traditional distribution channels measured by Nielsen ratings, which are the only viewership measurements relied upon by advertisers in determining what to pay for advertising. Brennan Decl., ¶ 10. This loss of

measured viewers impacts both the value of network advertising, and the willingness of major advertisers to invest in it.  If ratings are artificially deflated, because viewers are not measured, advertisers could simply choose other outlets or media.  Advertising is critical to Plaintiffs' ability to develop and acquire programming.  *Id.* ¶ 8.  Indeed, "[b]roadcast television stations and networks earn most of their revenues from advertising."  *ivi*, 691 F. at 285.  Given the significance of advertising to network business models, the harm that unauthorized streaming causes to Plaintiffs' ability to negotiate with advertisers has been recognized as irreparable.  *Id.; Aereo*, 2012 WL 2848158, at *22.

***Loss of Control Over Content and Threat of Viral Infringement.***  By distributing Plaintiffs' programming over the Internet without Plaintiffs having any say about the use of security and copy protection measures, Defendants expose Plaintiffs to virtually unlimited piracy, in addition to that already committed over FilmOnX.  Once digital copies are available and released on the Internet, vast viral infringement routinely follows.  For this reason, when Plaintiffs license their broadcasts for digital distribution, they contractually require distributors to adopt security measures to prevent piracy.  Plaintiffs also impose quality control measures to assure the quality of the viewing experience when consumers watch network programming.  Brennan Decl., ¶ 25.  By contrast, Plaintiffs have no ability to assure that Defendants or those who copy network programming from FilmOnX are doing anything to prevent further piracy or to assure the quality of retransmissions.  *See WTV Systems*, 824 F. Supp.2d at 1013-14.

In addition to these serious harms to Plaintiffs' legal interests, several other considerations support a finding of irreparable harm here.  *First*, the potential harm posed by a service like FilmOnX, if it is allowed to continue unabated, is only likely to increase.  ████████████████████████████████████████ ████████████████████████████████████████████.  Shepard Decl., Ex M (256:25-257:15).  That number appears set to grow significantly in the near

future.  Defendants recently broadened their potential user base by deploying

FilmOnX apps that are compatible with iPhones, Android Phones, the newly

launched Windows 8 operating system and Facebook.  *Id.* ¶¶ 2, 12, 17 Exs. C, D,

K.[14] ███████████████████████████████.  *Id.* Ex. M (169:23-

170:12, Depo. Ex. 4).  The FilmOnX app will also soon be distributed to "tens of

millions" of additional users through an agreement with Lenovo, the world's

leading PC manufacturer, to pre-load the app onto Lenovo computers.  *Id*. Ex. C,

Ex. M (186:21-188:16, Depo. Ex. 4).  In the six cities where FilmOnX is available,

Defendants already have the potential to distribute their unauthorized

retransmissions to over 18 million viewers.[15]  Not only will the new apps help

them reach more of these viewers, but Defendants also plan to expand to new

cities, thereby further increasing their user base and the potential harm they can

inflict on Plaintiffs' intellectual property and their business relationships.  *See*

*WTV Systems*, 824 F. Supp.2d at 1014 (finding that irreparable harm existed

because defendants' service was scalable to support millions of customers).

    *Second*, Defendants' illegal distribution model could easily be copied by

others, just as Defendants themselves copied earlier unauthorized, Internet

retransmission services.  *See ivi*, 691 F.3d at 28.  The potential impact of an

---

[14]  Upon learning of FilmOnX's app deployment, Fox filed copyright infringement notices with Apple. Microsoft and Google asking them to stop further distribution of the infringing Internet "apps."  Fox believes that these outlets (many of whom are Fox's partners in other ventures) were unaware of Aereokiller's illegal streaming, and they have agreed.  The applications, however, still remain on the devices upon which they have already been downloaded.  At various times, Defendants have stopped streaming one or more of Plaintiffs' local channels on or more of their websites or apps only to resume the unauthorized streaming without notice.  Shepard Decl., ¶ 8.  Plaintiffs should not be subject to the whims of Aereokiller and a preliminary injunction should be issued.  Moreover, Aereokiller's counsel has refused to confirm that Aereokiller will not resume streaming Fox broadcast channels.  Shepard Decl., ¶¶ 20-22.

[15]  According to a recent press release, FilmOnX is currently available to 5.6 million people in the Los Angeles market alone.  Shepard Decl., ¶ 4, Ex. A. Adding the populations of the other five major metropolitan areas where Defendants' service is available (Chicago, San Francisco, New York, Minneapolis and Dallas) the audience numbers exceed 18 million.  *Id.* ¶ 4, Ex. B.

explosion of unauthorized streaming websites on Plaintiffs' intellectual property and their distribution and advertising models plainly constitutes a threat of irreparable harm.  *Id.*

*Third*, the harms that Defendants' service threatens to inflict on the value of Plaintiffs' programming and advertising and the goodwill they have developed with their business partners and consumers are irreparable because they are "neither easily calculable, nor easily compensable."  *WTV Systems*, 824 F. Supp. 2d at 1013 (citing *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000).   As the District Court in *Aereo* acknowledged in finding that the plaintiff broadcasters and copyright holders in that case would be irreparably harmed in the absence of an injunction (which it determined it was otherwise "constrained" to deny under the *Cablevision* decision), "[h]arm of this sort has been accepted as irreparable based, at least in part, on the difficulty of . . . quantifying such damages."  *Aereo*, 2012 WL 2848158, at * 11 and 22.

*Finally*, Defendants' likely inability to compensate Plaintiffs for the substantial damages that are accruing as a result of the massive infringement that is occurring over FilmOnX further supports a finding of irreparable harm.  *ivi*, 691 F.3d at 286.  Plaintiffs are entitled to recover statutory damages of up to $150,000 per copyrighted work infringed for Defendants' willful infringement of their copyrights over FilmOnX.  *See* 17 U.S.C. § 504(c)(2).  Defendants currently stream dozens of network-owned programs every day.  Defendants only recently launched FilmOnX, and as startup companies, are unlikely to be able to satisfy the massive statutory damage award that may result if they are held liable for such extensive infringement. ██████████████████████████████████████ ████████████████████████████████████████.  Shepard Decl., Ex. M (144:7-13, 153:6-155:2, 195:6-197:5, 200: 22-201:5, Depo. Exs. 3, 4).  Accordingly, monetary damages are likely to be insufficient and an injunction

should issue.  *ivi*, 691 F.3d at 286; *Rosen Entm't Sys., LP v. Eiger Vision*, 343 F. Supp. 2d 908 (C.D. Cal. 2004).

In *ivi*, the Second Circuit had no trouble concluding, based on the multiple, irreparable harms outlined above, that unauthorized Internet streaming of network broadcasts "would drastically change the industry, to plaintiffs' detriment." *ivi*, 691 F.3d at 286.  As a result, the Court concluded:

> The absence of a preliminary injunction would encourage current and prospective retransmission rights holders, as well as other Internet services, to follow ivi's lead in retransmitting plaintiffs' copyrighted programming without their consent.  The strength of plaintiffs' negotiating platform and business model would decline.  The quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules – all would be adversely affected.  These harms would extend to other copyright holders of television programming. Continued live retransmission of copyrighted television programming over the Internet without consent would thus threaten to destabilize the entire industry. *Id.*

The same is true of Defendants' unauthorized Internet streaming service in this case.  It threatens Plaintiffs' intellectual property and their distribution and advertising models with irreparable harm and should be enjoined.  *ivi*, 691 F.3d at 284; *Salinger*, 607 F.3d at 81.

## C. The Balance Of Harms Tips Decidedly In Favor Of An Injunction

Defendants  "cannot complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities."  *Triad Sys. Corp. v. Southeast Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995); *see also Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) ("[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration").  Because a copyright infringer's complaint that ceasing its infringing conduct will harm its business is insufficient to defeat a request for a preliminary injunction, and because Defendants' business is clearly built upon

copyright infringement, the harms tip decidedly in Plaintiffs' favor.

Moreover, Defendants' have publicly professed that Plaintiffs' programming is unimportant to the FilmOnX service.  Shepard Decl, Ex. R and Ex. M (131:9-133:8, Depo. Ex. 2).  Thus, by their own admission, enjoining their unauthorized retransmission of Plaintiffs' programming will not cause them any meaningful harm.

### D. The Public Interest Favors An Injunction

The Supreme Court has made clear that upholding copyright protection is in the public interest.  *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003); *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir. 1994) ("public policy favors the issuance of injunctions in intellectual property infringement lawsuits").  The *ivi* court recently reaffirmed the strong public interest in protecting a copyright holder's exclusive interests and a "public interest in rewarding and incentivizing creative efforts."  691 F.3d at 288.  The court explained that the "public has a compelling interest in protecting copyright owners' marketable rights … and the economic incentive to continue creating television programming" because, without these protections, the "store of knowledge" may be diminished, and "encouraging the production of creative work … ultimately serves the public's interest in promoting the accessibility of such works."  *Id.*

In a holding directly applicable to this case, the *ivi* court concluded that "Plaintiffs are copyright owners of some of the world's most recognized and valuable television programming," concluded plaintiffs' works "provide[] a valuable service to the public, including, *inter alia*, educational, historic and cultural programming, entertainment, an important source of local news critical for an informed electorate, and exposure to the arts," and cautioned that if their works could be copied and streamed over the Internet against their will, their "desire to create original television programming surely would be dampened."  *Id.*  Here, as in *ivi* and the other cases cited above where infringement has been enjoined, the

24

1  public interest strongly favors an injunction and protecting the Plaintiffs' rights in

2  their valuable television programming.[16]

3  **IV.   CONCLUSION**

4         Plaintiffs respectfully request the Court grant their request for a preliminary

5  injunction.

6

7  Dated:    November 8, 2012                    ARNOLD & PORTER LLP

8

9                                               By: *James Blackburn*

10                                                  James S. Blackburn

11                                               Attorneys for Plaintiffs
                                                 Fox Television Stations, Inc., Twentieth
12                                               Century Fox Film Corp., and Fox
                                                 Broadcasting Company, Inc.
13

14

15

16

17

18

19

20

21

22  [16]  What will likely happen to original broadcast programming if an injunction is
    not issued will disserve the public interest.  As *ivi* recognized, where programming
23  is copied and streamed over the Internet against the copyright holder's will, the
    desire to create original television programming for broadcasting over-the-air will
24  be diminished.  691 F.3d at 288.  Hence, a risk exists that less broadcast
    programming will be created.  And, to the extent that original programming
25  continues to be developed by Plaintiffs, such programming will likely be placed on
    a cable channel where its value may be fully realized and will no longer be
26  available to the 54 million people who rely on broadcast television.  *See* Brennan
    Decl., ¶¶ 5, 13, Ex. B.  Such an outcome is contrary to the public interest.  *See*
27  *Satellite Broad. And Comm. Ass'n v. F.C.C.*, 275 F.3d 337, 343 (4th Cir. 2001)
    (upholding the importance of "free television for those not served by satellite or
28  cable").