UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 12-6950-GW(Ex) | Date | December 27, 2012 |
| Title | NBCUniversal Media, LLC, et al. v. Barry Driller, Inc., et al. | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Kane Tien | Wil Wilcox | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| James S. Blackburn | Ryan G. Baker |
| John C. Ulin | Jaime W. Marquart |

**PROCEEDINGS:**     PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (filed 11/08/12)


Court hears oral argument.  The Tentative Final Ruling circulated and attached hereto, is adopted as the Court's final ruling.  The Court **GRANTS IN PART** Plaintiffs' motion for preliminary injunction.  Court signs the proposed order.

The Court accepts the following stipulation placed on the record:

  1. Within two weeks of today's date, Plaintiffs shall receive a representation or representations under oath from an officer competent to speak for both Aereokiller and FilmOn with respect to the mini antennae for each applicable local station are located in the locality for that local station defined as the Nielson DMA for each particular local station.

  2. All statements in slide number 5 of the technology tutorial presented by defendants entitled Aereokiller's Mini Antenna Technology (attached as Exhibit A) in fact occur completely within the locality of each applicable local station that is retransmitted defined as the local DMA.  This includes the web server, antenna router, antenna tuner, server, Aereokiller antennas, the encoder, the DVR folders, and the delivery or sometimes called the streaming server.

  3. None of these steps are accomplished by backhaul or any other method whereby the signal comes through the Ninth Circuit and goes back out to these local DMAs.

|  | : | 30 |
|---|---|---|
| | Initials of Preparer | KTI |

<u>*Fox Television Stations, Inc. v. Aereokiller, LLC*</u>, Case No. CV-12-6921
<u>*NBCUniversal Media, LLC v. Aereokiller, LLC*</u>, Case No. CV-12-6950
Tentative Final Ruling on Motion for Preliminary Injunction

## I. Introduction

Plaintiffs Fox Television Stations, Inc., Twentieth Century Fox Film Corp., and Fox Broadcasting Co., Inc. (in CV-12-6921), and Plaintiffs NBCUniversal Media LLC, Universal Network Television LLC, Open 4 Business Productions LLC, NBC Subsidiary (KNBC-TV) LLC, Telemundo Network Group LLC, WNJU-TV Broadcasting LLC, American Broadcasting Companies, Inc., ABC Holding Company Inc., Disney Enterprises, Inc., CBS Broadcasting Inc., CBS Studios Inc., and Big Ticket Televison, Inc. (in CV-12-6950) (collectively, "Plaintiffs") moved for a preliminary injunction against Defendants Aereokiller LLC, Alkiviades "Alki" David, FilmOn.TV Networks, Inc., Filmon.TV, Inc., and FilmOn.com, Inc. (collectively, "Defendants").[1] Plaintiffs filed an identical motion in each action. Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction ("Mot."), Docket No. 49 at 1 n.1.[2]

Plaintiffs produce and license the distribution of copyrighted works that appear on free, over-the-air broadcast television networks. *Id.* at 4.[3] Plaintiffs also license that programming for distribution through cable and satellite television, and through services such as Hulu.com and Apple's iTunes. *Id.* at 5. Plaintiffs accuse Defendants of offering their copyrighted content through internet and mobile device streaming. *Id.* at 5. Defendants do not deny that they retransmit Plaintiffs' copyrighted broadcast programming, but argue that their service is legal because it is technologically analogous to the service which the Southern District of New York found to be non-infringing in *Am. Broad. Cos. v. AEREO, Inc.*, No. 12 Civ. 1540 (AJN), 2012 U.S. Dist LEXIS 96309 (S.D.N.Y. July 11, 2012) ("*Aereo*").[4] Defendants contend that their systems are "better and more legally defensible than Aereo's," but that the systems are similar in allowing users to use an individual mini digital antenna and DVR to watch or record a free television broadcast." Opp'n., Docket No. 46 at 1. Defendants characterize their system as offering "a user-directed private viewing of already available, free over-the-air television content using the same antenna and tuner technology employed by consumers for years." *Id.*[5]

---

[1] Plaintiffs initially sued and moved for a preliminary injunction against BarryDriller Content Systems, Plc. and BarryDriller Inc. After discussing which entities existed and had involvement in the conduct at issue, the parties stipulated to the filing of a Second Amended Complaint that names the current defendants only. Docket No. 51.

[2] All references to docket numbers are to CV-12-6921.

[3] Plaintiffs have presented evidence of their ownership of the copyrights in the broadcast material they accuse Defendants of infringing. Decl. of Marsha Reed, Docket No. 41-11, Decl. of Carly Seabrook, Docket No. 41-10, Decl. of Rebecca Borden, Docket No. 41-13. Defendants have not challenged Plaintiffs' ownership of the copyrights.

[4] An appeal was taken in *Aereo* and the Second Circuit heard oral argument on November 30, 2012. Nos. 12-2807-cv and 12-2786-cv (filed July 16, 2012).

[5] Plaintiffs' expert argues that there are a number of elements that are present in the Aereo system that Defendants have not identified as part of their system. Decl. of Nigel Jones in Support of Plaintiffs' Reply ("Jones Decl."), Docket No. 52-2 at ¶ 7 and Ex. D (article about the Aereo system). But the Court cannot discern which of the *Aereo*-like elements Jones identifies as missing from the Defendants' system are material to the determination in *Aereo* that the transmissions in question are private rather than public. As just one example, Plaintiffs' expert states that the declaration submitted by Defendants' Chief Technology Officer does not mention a demodulator. Jones Decl., Docket No. 52-2 at 4. But neither does the *Aereo* decision, so the Court is left to wonder as to Plaintiffs' contention regarding the legal significance of the omission.

1

## II. Legal Standards
### A. Preliminary Injunctive Relief
A plaintiff seeking a preliminary injunction must establish: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[6]

### B. Geographical Reach of Injunction Where Circuit Split Present
Courts should not issue nationwide injunctions where the injunction would not issue under the law of another circuit.
> Principles of comity require that, once a sister circuit has spoken to an issue, that pronouncement is the law of that geographical area. Courts in the Ninth Circuit should not grant relief that would cause substantial interference with the established judicial pronouncements of such sister circuits. To hold otherwise would create tension between circuits and would encourage forum shopping.

*United States v. AMC Entm't, Inc.*, 549 F.3d 760, 773 (9th Cir. 2008) (reversing grant of nationwide injunction).

### C. Copyright Infringement
Plaintiffs must meet two requirements to present a prima facie case of direct infringement: (1) ownership of the infringed material, and (2) violation of at least one exclusive right granted to copyright holders under 17 U.S.C. § 106 by the infringer. *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).[7]

---

Defendants have moved to strike and objected to the Jones Decl. The Court would deny the motion to strike and overrule the objections. The Court would find that the Jones Decl. fairly responds to the Defendants' arguments, and does not consist of material that should have been submitted earlier, and the evidentiary objections are not well-taken (although Jones's use of Aereo's patent applications is not helpful because the relevant question is whether Defendants' service resembles what the *Aereo* decision described, not whether it resembles what Aereo put in its patent applications).

[6] The Court will not apply the standard set forth in *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2010), as it views that standard as being in conflict with both the Supreme Court's ruling in *Winter* and the Ninth Circuit's own subsequent adoption of the *Winter* standard. *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) ("To the extent that our cases have suggested a lesser standard [than that announced in *Winter*], they are no longer controlling, or even viable."). It is a commonplace observation that one three-judge panel of the Ninth Circuit may not overrule an earlier three-judge panel in the absence of intervening controlling Supreme Court precedent, *see United States v. Mayer*, 560 F.3d 948, 964 (9th Cir.), *cert. denied*, 130 S.Ct. 158 (2009) (though the Court might note that other district courts within the Circuit have followed *Alliance for Wild Rockies* without questioning its apparent conflict with earlier Circuit authority).

[7] Plaintiffs characterize the issue of whether Defendants' service falls within the analysis of the *Aereo* decision as a "defense" and argues that Defendants bear the burden of establishing it. Mot., Docket No. 49 at 9, 3. But *Aereo* found that "that Aereo's service is likely lawful," not that Aereo had succeeded in proving a "defense." 2012 U.S. Dist. LEXIS 96309 at *89 (emphasis added). Plaintiff bears the burden of proving copyright infringement. *A&M Records* at 1013. "[T]he burdens at the preliminary injunction stage track the burdens at trial." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007). *Perfect 10* involved the affirmative defense of fair use, but even where a plaintiff bears the burden of proof, once the plaintiff has established its prima facie case, the burden shifts to the defendant to rebut it. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 541 (1985) (holding that once plaintiff establishes a prima facie damages nexus for copyright infringement, the burden shifts to the defendant).

III. **Analysis**
    ***A. The Court Would Grant In Part and Deny In Part Defendants' Request for Judicial Notice***

Defendants request that the Court take judicial notice of a scheduling order and two amicus briefs filed in *Aereo*. Docket No. 46-1. Under Fed. R. Evid. 201, the Court can take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Courts may take judicial notice of another court's opinion for the existence of the opinion, but not for the truth of the facts recited therein. *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001). The Court would take judicial notice of the scheduling order. The Court would not take judicial notice of the amicus briefs because, as Plaintiffs object, the request is an implicit attempt to extend Defendants' page limits without leave, or to file amicus briefs without leave. *Cadence, LLC v. Dimension Data Holdings*, PLC, 222 F. App'x 563, 566 (9th Cir. 2007) (district court did not abuse its discretion in refusing to consider briefing that party attempted to incorporate by reference).[8]

    ***B. The Court Would Grant Plaintiffs' Request for an Injunction***
        *1.* <u>Likelihood of Success on the Merits</u>

Plaintiffs argue that Defendants' internet retransmission service infringes their exclusive right to make public transmissions of their copyrighted works.[9] Defendants do not deny Plaintiffs' ownership of the copyrights or Defendants' transmission of the copyrighted works but argue that, due to the architecture of their systems, their transmissions are *private*, not public. Assuming that Defendants accurately describe their technology – which Plaintiffs dispute – Second Circuit law would support Defendants' position, because cases there have held that where a transmission of a work over the internet is made from a copy of a work made at the direction of and solely for use by single user, there is no public transmission. But, that Second Circuit law has not been adopted in the Ninth Circuit, and this Court would find that the Ninth Circuit's precedents do not support adopting the Second Circuit's position on the issue. Instead,

---

[8] The Court would not find it necessary to reach Plaintiffs' evidentiary objections nos. 2-4, which go to the characterization of facts recited in Defendants' attorney's declaration. Plaintiffs' Evidentiary Objections, Docket No. 52-3. Nor would the Court find it necessary to reach Plaintiffs' evidentiary objection no. 5, which concerns allegations related to a collateral lawsuit. The Court would overrule Plaintiffs' evidentiary objections nos. 6-8, which merely dispute the accuracy of factual assertions made by Defendant Alkiviades David or argue that he did not adequately respond to questions at his deposition.

    Additionally, Defendants contend in response to Plaintiffs' objections that they only seek judicial notice of the existence of the amicus briefs filed in the *Aereo* case in the Southern district of New York, and have not offered them for their content. Def.'s Resp. to Pl.'s Evidentiary Objections, Docket No. 66 at 1. Nonetheless, Defendants argue that the very existence of the briefs shows that Defendants' technology serves an important public interest. *Id.* However, it is impossible to draw that conclusion without examining the content of the proffered briefs.

[9] Plaintiffs argue that *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012), held that "retransmitting over-the-air television via the Internet to subscribers" is a public performance. That is too simple a distillation of *ivi*, which did hold that the internet service at issue made public performances of copyrighted works, but did not consider the question raised in *Aereo* and at issue here – whether it is a public performance to receive a broadcast with an antenna assigned to a single subscriber, and then retransmit that separately-received transmission over the internet to a particular subscriber. Likewise, Plaintiffs argue that "*Cablevision* did not address the making of automatic buffer copies to facilitate live streaming of television broadcasts over the Internet," but that its analysis "strongly suggests" that such automatic buffer copies are a public performance. Reply, Docket No. 52 at 8. Plaintiffs seem to be relying on the fact that courts have found "streaming" to be infringement of the transmission right, and are arguing that streaming's use of buffer copies means that the buffer copy is itself a public performance. But Plaintiffs have cited to no authority that holds that the act of creating the transient buffer copy – expressly considered in *Cablevision* and held not to be an act of infringement – is an infringement of the public performance right. *Cablevision*, 536 F.3d at 127.

3

the Court would find that Defendants' transmissions are public performances, and therefore infringe Plaintiffs' exclusive right of public performance.

>                    *a. Defendants Infringe Plaintiffs' Exclusive Transmission Rights*

The Transmit Clause of the Copyright Act, 17 U.S.C. § 106(4), vests in a copyright holder the exclusive right "to perform the copyrighted work publicly." 17 U.S.C. § 101 defines a public performance to mean, *inter alia*, "to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." Defendants maintain that under Second Circuit law, they are not making public performances of Plaintiffs' copyrighted content.

In *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), the Second Circuit considered the question of whether a system that made a unique copy of a television program requested by a user and then transmitted that program from the user-specific copy solely to that user violated the copyright holder's exclusive public performance right. The Second Circuit first parsed the statutory definition of public performance, and concluded that "[t]he fact that the statute says 'capable of receiving the performance,' instead of 'capable of receiving the transmission,' underscores the fact that a transmission of a performance is itself a performance." *Id.* at 134. The Second Circuit then reasoned that unless the transmission itself is public, the transmitter has not infringed the public performance right. *Id.* at 134-40.

That is not the only possible reading of the statute. The definition section sets forth what constitutes a public performance of a copyrighted *work*, and says that transmitting a performance to the public is a public performance. It does not require a "performance" of a performance. The Second Circuit buttressed its definition with a "*cf.*" to *Buck v. Jewell-La Salle Realty Co.*, 283 U.S. 191, 196 (1931), which interpreted the 1909 Copyright Act's provision of an exclusive right to publicly perform a musical composition and held that "the reception of a radio broadcast and its translation into audible sound" is a performance. But *Buck*, like *Cablevision* and this case, was concerned with a copyright in the *work* that was broadcast. *Id.* at 195. The Supreme Court was not concerned about the "performance of the performance" – instead, it held that using a radio to perform the copyrighted song infringed the exclusive right to perform the song (not to perform the performance of the song). *Id* at 196.

The Second Circuit further supported its position via citation to the House Report on the 1976 Copyright Act, which states that "a performance made *available by transmission to the public at large* is 'public' even though the recipients are not gathered in a single place . . . . The same principles apply whenever the *potential recipients of the transmission* represent a limited segment of the public, such as the occupants of hotel rooms or the subscribers of a cable television service," and thus, reasoned that the *transmission* had to itself be public. *Cablevision* at 135 (emphasis in *Cablevision*).[10] The Second Circuit concluded that as a result of its above analysis:

> the transmit clause directs us to examine who precisely is "capable
> of receiving" a particular transmission of a performance. [B]ecause
> each RS-DVR transmission is made using a single unique copy of a
> work, made by an individual subscriber, one that can be decoded
> exclusively by that subscriber's cable box, only one subscriber is
> capable of receiving any given RS-DVR transmission.

---

[10] The Second Circuit appears to implicitly bracket the text of the House Report like this: [a performance made available by] [transmission to the public]. It seems like the House Report could just as easily be read like this: [a performance made available by transmission] [to the public]. Defendants make Plaintiffs' copyrighted works available to the public by transmission. The Second Circuit's reading effectively converts "available by transmission" to "available by a single transmission." In any event, the *statute* uses the verb "transmit," rather than the noun used in the House Report.

*Id.* at 135. But the House Report did not discuss *which copy* of a work a transmission was made from. The statute provides an exclusive right to transmit a performance publicly, but does not by its express terms require that two members of the public receive the performance from the same transmission. The statute provides that the right to transmit is exclusive "whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101. Again, the concern is with the performance of the copyrighted *work*, irrespective of which copy of the work the transmission is made from. Very few people gather around their oscilloscopes to admire the sinusoidal waves of a television broadcast *transmission*. People are interested in watching the *performance* of the *work*. And it is the public performance of the copyrighted work with which the Copyright Act, by its express language, is concerned. Thus, *Cablevision's* focus on the uniqueness of the individual copy from which a transmission is made is not commanded by the statute.

      The Second Circuit's focus is also in tension with precedent in the Ninth Circuit. *Cablevision* expressly disagreed with *On Command Video Corp. v. Columbia Pictures Industries*, 777 F. Supp. 787 (N.D. Cal. 1991), which held that a hotel system that transmitted to individual hotel rooms movies being played from individual videotapes by remote control from a central bank in a hotel equipment room violated the copyright holder's public performance right. The Second Circuit believed *On Command* wrongly decided, but also distinguished *On Command* on the basis that the hotel system at issue there made multiple successive transmissions to different members of the public from a single copy of the work, whereas Cablevision's system used a separate copy of each work to make the transmission. *Cablevision* at 138-39. That is only a relevant distinction if one focuses on whether the transmission is publicly performed. Precedent in the Ninth Circuit instead properly looks at public performance of the copyrighted work.

      In *Aereo*, the Southern District of New York recently applied *Cablevision* to find that a service that assigned each user a unique antenna, allowing each user to watch over the internet live or recorded television broadcasts received by the user's unique antenna, did not infringe the copyright holder's right of public performance. Following *Cablevision*, *Aereo* found no infringement because the defendant's service operated such that the broadcasts captured by the individual user's assigned antenna were never shared with or accessible to any other user. *Aereo*, 2012 U.S. Dist LEXIS 96309, at *10.

      In addition to their reliance on their interpretation of the text of the Copyright Act,[11] the Second Circuit in *Cablevision* and the Southern District of New York in *Aereo* also reached their results by reasoning that the defendant was providing a service equivalent to what individuals could lawfully do for themselves. *Cablevision* at 136 (discussing hypothetical, albeit nonexistent, liability for the "hapless customer who records a program in his den and later transmits the recording to a television in his bedroom"[12]); *Aereo*, 2012 U.S. Dist LEXIS 96309, at *9, *36

---

[11] Judge Posner has criticized the purely formalist textual analytic approach to copyright cases involving alleged infringement of the performance right:
> To suppose that the cable television case can rationally be decided by determining whether cable television is more like a homeowner's putting up an antenna than it is like hiring an orchestra to perform copyrighted music is absurd. A rational resolution of the issue requires discerning the purpose of giving the owner of a copyrighted work the exclusive right to perform it. The purpose is to prevent the form of free riding that consists of waiting for someone to spend money creating a valuable expressive work and then preventing him from recouping his investment by copying the work and selling copies at a price below the price the creator of the work would have to charge to break even.

Richard A. Posner, *Reasoning by Analogy*, 91 Cornell L. Rev. 761, 771 (2006). Posner's argument supports Plaintiffs' position here.

[12] *Cf. Buck*, 283 U.S. at 196. There is nothing public about such a performance. By contrast, this case involves a commercial service transmitting copyrighted content to thousands, and potentially millions, of people.

("the functionality of Aereo's system from the user's perspective substantially mirrors that available using devices such as a DVR or Slingbox, which allow users to access free, over-the-air broadcast television on mobile internet devices of their choosing"). But Congress has rejected that mode of reasoning in this context. The equivalency between (1) what individuals could lawfully do for themselves and (2) what a commercial provider doing the same thing for a number of individuals could lawfully do, was the basis of the Supreme Court's cable television jurisprudence before the 1976 Copyright Act. The Supreme Court held that if an individual:

> erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be 'performing' the programs he received on his television set. The result would be no different if several people combined to erect a cooperative antenna for the same purpose. The only difference in the case of CATV is that the antenna system is erected and owned not by its users but by an entrepreneur.

*Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 400 (1968). Acting in response to *Fortnightly*, Congress found the difference significant and legislated accordingly in the 1976 Copyright Act. As Plaintiffs point out, Congress found that "cable systems are commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material and . . . copyright royalties should be paid by cable operators to the creators of such programs." *See* H.R. Rep. No. 94-1476, at 88-89 (1976), cited in Reply, Docket No. 52 at 4. So too here. The Court finds that Defendants' unique-copy transmission argument based on *Cablevision* and *Aereo* is not binding in the Ninth Circuit.[13]

At the Motion hearing, Defendants urged that *Cablevision* was only important to their argument insofar as it recognized the importance of customer control and held that a cable company was not liable for the acts of its customers. But as *Aereo* followed *Cablevision's* holding that the transmission from unique copies avoids infringement of the public performance right, that aspect of *Cablevision* in fact appears central to Defendants' argument in this case.

At the hearing, Defendants also analogized their service to self-contained portable televisions of the kind that have been available for many years which can be used, *e.g.*, by attendees at a football game to watch another game being played at the same time. That argument ignores a key distinction. In marked contrast to Defendants' system here, such portable televisions play the broadcast signal within inches of the place the signal is received by the attached antenna, and do not "send[] out some sort of signal via a device or process to be received by the public at a place beyond the place from which it is sent." *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 866 F.2d 278, 282 (9th Cir. 1989).

Thus, Plaintiffs have shown a likelihood of success on the merits on their public performance theory of liability, at least within the Ninth Circuit.[14]

### 2. Irreparable Harm

Plaintiffs have demonstrated irreparable harm. Revenues from retransmission consent licensing have become increasingly important to the broadcast industry, and are used to fund the development and acquisition of broadcast programming. Decl. of Sherry Brennan in Support of Mot. ("Brennan Decl."), Docket No. 41-9, at ¶ 15. Defendants' service threatens to damage Plaintiffs' ability to negotiate favorable retransmission consent agreements with cable, satellite

---

[13] Plaintiffs did not brief their theory of liability for copying. Reply, Docket No. 52 at 18. This decision expresses no position on the outcome of the *Cablevision* case itself under Ninth Circuit law.

[14] There potentially arose in this case an issue as to whether internet retransmission services are properly classified as "cable systems" and thus potentially entitled to a compulsory license. However, this ruling does not address that issue because it was expressly disclaimed by Defendants: "The entire first half of the *ivi* Court's analysis as to likelihood of success was devoted to a 'cable system' affirmative defense that is not being asserted by Defendants in this case and, therefore, is wholly inapplicable." Opposition, Docket No. 46 at 18.

and telecommunications providers. *Id.* at ¶¶ 15-17. If Defendants can transmit Plaintiffs' content without paying a fee, Plaintiffs' existing and prospective licensees will demand concessions to make up the loss of viewership to non-paying alternatives, and may push additional players away from license-fee paying technologies and toward free technologies like Defendants'. The availability of Plaintiffs' content from sources other than Plaintiffs also damages Plaintiffs' goodwill with their licensees. *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012-1013 (C.D. Cal. 2011) ("*WTV*"), Brennan Decl., Docket No. 41-9 at ¶¶ 15-17.

Defendants' service also competes with Plaintiffs' ability to develop their own internet distribution channels. Plaintiffs license a variety of entities, including Hulu.com (which licenses content from Fox, NBC and ABC for internet distribution) and Apple (which licenses content from all four networks for distribution through iTunes) to distribute programming over the Internet on a time-delayed basis. Brennan Decl., Docket No. 41-9 at ¶¶ 18-20. Defendants' competing activity puts the same kind of pressure on those licensing relationships as it does on Plaintiffs' traditional retransmission relationships, but to a greater degree, because the services are more directly substitutable. The same is true for Plaintiffs' proprietary internet distribution websites and mobile applications. *Id.* ¶¶ 18, 21-23.

Because Defendants divert users who would otherwise access Plaintiffs' content in a way that includes the users in the measurement of the audience for purposes of advertising revenue calculation, Defendants' service also harms Plaintiffs' position in their negotiations with advertisers. *Id.* ¶¶ 8-13, *Aereo*, 2012 U.S. Dist. LEXIS 96309 at *72.

The foregoing harms are irreparable because they are "neither easily calculable, nor easily compensable." *WTV*, 824 F. Supp. 2d at 1013, *Aereo*, 2012 U.S. Dist. LEXIS 96309 at *72. Further, given the extent of Defendants' retransmissions, and the large statutory damages that may be available, it is unlikely that Defendants' start-up companies would be likely to be able to satisfy the damages award.

    3. <u>Balance of Harms</u>

Defendants "cannot complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities." *Triad Sys. Corp. v. Southeast Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995). To the extent that the Court finds that Plaintiffs are likely to succeed on the merits here, then Defendants have no equitable interest in continuing an infringing activity. *Id.* (citing *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir.1988) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration'"); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) (in motion for preliminary injunction, district court should not consider the "devastating effect" of the injunction on the infringer's business).

    4. <u>Public Interest</u>

There is "a public interest in making television broadcasting more available." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 454 (1984). That public interest could in theory cut both ways in the case, which pits television creators and broadcasters against those who seek to use that broadcasting without payment, or at least without permission. But here, the public interest factor is inextricably bound up in how the Court decides the merits, which it does in light of Congress's enactment and revisions to the Copyright Law. "[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *WTV*, 824 F. Supp. 2d at 1015 (citing *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir.1983) (internal quotations omitted)). Thus, the public interest would be served by an injunction if Plaintiffs are likely to succeed on the merits.

### B. *The Injunction Will Be of Limited Geographic Scope*

Given the application of Ninth Circuit law that differs from Second Circuit law, principles of comity prevent the entry of an injunction that would apply to the Second Circuit. *United States v. AMC Entm't, Inc.*, 549 F.3d 760 (9th Cir. 2008). If other circuits do not have law that conflicts with this decision, they might adopt such law when presented with the choice. The Court would therefore issue an injunction covering only the Ninth Circuit.[15]

The parties submitted briefing on the issue of geographical scope on December 26, 2012. Plaintiffs argue that, based on Defendants' argument at the motion hearing, Defendants have abandoned their reliance on *Cablevision* and *Aereo*, and instead reply on more general arguments in Supreme Court cases that were superseded by the 1976 Copyright Act. Joint Submission Re (1) Geographic Scope of Preliminary Injunction and (2) Amount of Preliminary Injunction Bond, Docket No. 74 at 1. Whether Defendants meant exactly that is unclear, but in any event, the Court's foregoing analysis rests explicitly on interpreting the statutory language differently than the Second Circuit did in *Cablevision*.

Plaintiffs argue that even focusing on *Cablevision*, the Second Circuit is the only potential limitation to a nationwide injunction, because "[n]o other Circuit has adopted the public performance analysis in *Cablevision* . . . ." Docket No. 74 at 1-2. However, the Court notes that the copyright-holder plaintiffs in *Cablevision* – a group that included many of the Plaintiffs in this case – had every reason to seek rulings contrary to *Cablevision's* public performance analysis in the other circuits in the four years after *Cablevision*, and do not appear to have done so. In those circumstances, the Court would not assume that the other Circuits would agree with a decision from this Court rather than *Cablevision*.

### C. *Bond Amount*

Fed. R. Civ. P. 65(c) requires the party requesting the preliminary injunction to provide security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." The parties submitted briefing on the proper bond amount on December 26, 2012. Plaintiffs argue that no bond at all, or only a minimal bond, is required. Docket No. 74 at 3. Plaintiffs argue that Defendant David disclaimed Defendants' interest in free to air TV in August, that Defendants have over 150 channels, that Defendants voluntarily ceased streaming Fox in late October with no adverse impact on its business, and that Defendants have only 60 paying subscribers for access to Plaintiffs' local channels. *Id*.

Defendants for a very substantial bond of $15 million. They argue that Defendant FilmOn was capitalized with at least $19 Million, of which $10 Million was dedicated to the technology at issue, that Defendants will lose a substantial amount of that investment if wrongfully enjoined, and that Plaintiffs have argued that Defendants stand to take millions of dollars worth of market share if not enjoined (Defendants imply that they stand to gain a similar amount, although Defendants have not presented evidence of that).

Defendants' arguments do not take into account the limited geographical scope of the injunction, fail to explain why any portion of their technology investment would be wasted in the event that Defendants act quickly and successfully to obtain a reversal of the preliminary injunction decision, and do not address Plaintiffs' points about Defendants' non-infringing offerings. Given the limited factual submissions, the Court finds it difficult to ascertain an appropriate bond amount with certainty. The damage to Defendants of an incorrectly entered injunction could be greater than the loss of its current paying subscribers. It could, and would likely try, to obtain others, and Plaintiffs have pointed out that Defendants receive advertising revenue from their free service. Yet, Defendants have not provided the Court with competent evidence of that revenue. Given the information provided by both sides, the Court would set the

---

[15] That should be possible because Defendants claim to be able to limit their service geographically. Shepard Decl., Docket No. 50, Ex. M (Nov. 1, 2012 Deposition of Alkiviades David as Defendants' 30(b)(6) witness), at 206.

8

bond in the amount of $250,000 (two hundred and fifty thousand dollars).

## IV. Conclusion

The Court would grant Plaintiffs' motion for preliminary injunction. The terms of the injunction and bond requirements will be set forth in separate orders issued in each case.

# EXHIBIT A

Case 2:12-cv-06950-GW-JC   Document 81   Filed 12/27/12   Page 11 of 12   Page ID #:1702

